# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

KATHRYN SACK,

        Plaintiff,

        v.

U.S. DEPARTMENT OF DEFENSE,

        Defendant.

</td><td>

Civil Action No. 12-cv-1754 (RLW)

</td></tr>
</table>

## AMENDED MEMORANDUM OPINION[1]

Plaintiff Kathryn Sack, a University of Virginia graduate student, brings this Freedom of Information Act ("FOIA") challenge against the Department of Defense ("DoD"), *vis-à-vis* its component agencies, the Defense Intelligence Agency ("DIA") and the National Security Agency ("NSA"). Through her remaining claims, Sack argues that DIA failed to adequately search for records responsive to her FOIA requests and that it improperly withheld documents under FOIA's statutory exemptions. Additionally, Sack complains that NSA failed to categorize her as an "educational institution" requester and wrongly failed to provide her with two free hours of search time. The matter is presently before the Court on the Department's Motion for Summary Judgment. (Dkt. No. 22). Finding that DIA's search methods were sound, and that DIA appropriately relied upon Exemption 7(E) to withhold the contested documents from release, the Court concludes that Sack's claims involving DIA lack merit. With respect to NSA, however, the Court agrees that the record contains insufficient evidence to classify Sack as an "educational institution" requester. Additionally, the Court rejects Sack's arguments surrounding the two hours of free search time. Accordingly, having carefully considered the parties' briefing,

---

[1] The Court's original opinion contained an error in the opening summary.

the entire record in this action, and the governing authorities and precedents, the Court concludes

for the reasons that follow, that the Department's Motion will be **GRANTED**.

## BACKGROUND

### A. Factual Background

Plaintiff Kathryn Sack ("Sack") is a University of Virginia graduate student preparing her

dissertation on the issue of polygraph bias.[2]   (Compl. at ¶ 4).   To gather more information in

connection with her research, Sack filed eleven different FOIA requests with DIA and NSA, all

of which generally sought information concerning the agencies' polygraph programs.   Although

Sack's Complaint asserts thirteen (13) separate counts, the scope of her claims has narrowed

considerably during the pendency of this action.   For purposes of this Opinion, the Court

summarizes only the salient facts bearing on the claims that remain in dispute.[3]

### 1. Count II: DIA Request No. 0193-2011

On February 14, 2011, Sack filed three FOIA requests with DIA, only one of which

remains at issue.   Through that request, which Sack pursues through Count II of her Complaint,

she sought "[a]ll records maintained by [DIA's] security office representing aggregate data of

polygraph examinations."   (Dkt. No. 22-1 ("Williams Decl.") at ¶ 10, Ex. 3).   DIA originally

responded to Sack about one week later, on February 22, 2011, assigning her inquiry Request

No. 0193-2011.   (*Id.* ¶ 11, Ex. 4).   Inexplicably, Sack's request then sat dormant for quite some

---

[2]     In the Complaint, the plaintiff is identified as "Kathryn Sack."   Most of the documents found elsewhere in the record, though, refer to a "Katelyn Sack."   This incongruity is never explained by the parties, but the Court presumes that both names refer to the plaintiff here.

[3]     For simplicity's sake, the Court summarizes Sack's claims in the sequence they appear in the Complaint, recognizing that, in some cases, the facts do not proceed chronologically.

time until April 2012, when DIA eventually tasked the National Center for Credibility Assessment ("NCCA") to search for responsive records. (*Id.* ¶ 12).[4]

While Sack's request expressly sought records only from DIA's Office of Security, DIA determined that responsive information was most likely to be located within NCCA, rather than the Office of Security. (*Id.* ¶¶ 6, 8). In turn, NCCA searched its electronic records systems for information responsive to the request, using its "ProCite Database" and the NCCA shared computer electronic storage drive; NCCA also searched its paper filing system. (*Id.* ¶ 12). For its electronic search, NCCA used keywords it thought calibrated to locate any potentially responsive records, including "bias," "gender," "race," "age," and "sexual orientation." (*Id.*). Moreover, though DIA did not reasonably expect any results, DIA also asked the Office of Security to review its records, but the Office of Security confirmed that it does not maintain any aggregate data responsive to Sack's request. (*Id.*). Ultimately, neither NCCA nor the Office of Security located any records responsive to this particular request.

### 2. Counts V and VI: NSA Request Nos. 64010 and 64011

Sack also submitted three FOIA requests to NSA on or around February 14, 2011. Two of these requests—pled through Counts V and VI of her Complaint—remain in dispute. Therein, Sack sought records representing aggregate data of polygraph examinations and records pertaining to equal employment opportunity rules and polygraphs, respectively. (*See* Compl. at ¶¶ 32-43). Sack also sought classification as an "academic" or "educational institution"

---

[4]     DIA explains—and Sack does not dispute—that NCCA "serves as the government's premiere educational center for polygraph and other credibility assessment technologies and techniques. Its central mission is to assist federal agencies in the protection of U.S. citizens, interests, infrastructure and security by providing the best education and tools for credibility assessment and to manage the Quality Assurance Program that develops, implements, and provides oversight of psychophysiological detection of deception (PDD) standards for the federal polygraph programs." (Williams Decl. at ¶ 6).

requester, which would have exempted her from the search-related costs associated with her request. (*See* Dkt. No. 22-3 ("Janosek Decl.") at Ex. 1). NSA acknowledged receipt of Sack's requests on March 10, 2011, assigning them case numbers 64010 and 64011. (*Id.*, Ex. 2). Through this same response, NSA stated that Sack could not be classified as an "academic" requester, explaining that she did not meet the criteria for "educational institution" as defined in the Code of Federal Regulations; more specifically, NSA did not believe Sack's request was made on behalf of the University of Virginia. (*Id.* ¶ 9, Ex. 2).[5] Instead, NSA classified Sack as an "all other" requester, which meant that under DoD regulations, Sack was obligated to pay for search time in excess of two hours. (*Id.* at Ex. 2). Based on its initial assessment, NSA estimated that the applicable search costs (not including the two free hours of search time) would amount to approximately $880.00. (*Id.* ¶ 14, Ex. 2). NSA explained that Sack would be required to remit one-half of the total cost estimate ($440.00) before NSA would commence its search efforts.

Rather than doing so, Sack appealed this determination in May 2012. (*Id.* ¶ 16, Ex. 3). As part of that appeal, Sack attached a letter from the University of Virginia's Director of Graduate Studies, Professor Jeffrey Jenkins, stating that Sack's objectives were "consistent with [the University's] scholarly research goals" and confirming that Sack was "acting as a representative of the University of Virginia's Department of Politics." (*Id.*, Ex. 3). The NSA FOIA Appeal Authority denied Sack's appeal by letter dated January 17, 2013. (*Id.* ¶ 17, Ex. 4). NSA found Mr. Jenkins' letter insufficient because it confirmed that Sack was "a Ph.D. student and President's Fellow rather than a member of the faculty," and because it did not come from

---

[5] Sack also sought a "public interest" fee waiver under 5 U.S.C. § 552(a)(4)(A)(iii), which NSA denied in this same response. While part of her original claims in this case, Sack no longer challenges NSA's determination on the "public interest" waiver. (*See* Pl's Opp'n at 2).

the Department's Chair. (*Id.*). NSA also found significant that Sack's counsel was representing only Sack individually, and not the University of Virginia or its Department of Politics. (*Id.*). Thus, Sack remained classified as an "all other" requester, with NSA requiring that Sack remit a portion of the estimated search costs before it would process her requests.

### 3. Count IX: DIA Request No. 0069-2010

On October 23, 2009, Sack filed a FOIA request with DIA seeking Department of Defense Polygraph Institute ("DoDPI") and Defense Academy of Credibility Assessment ("DACA") records that would reflect polygraph examination bias research and studies. (Williams Decl. at ¶ 9, Ex. 8).[6] Although DIA acknowledged receipt on December 18, 2009, as with Sack's other requests, it seems DIA did not take any further action for some time. (*Id.* ¶ 17). Eventually, in or around April 2012, DIA conducted a search for records within NCCA, both within its paper filing system and its electronic records. (*Id.* ¶ 18). For purposes of the electronic review, NCCA again searched its ProCite Database and the NCCA shared computer electronic storage drive, using the keywords "bias," "gender," "race," "age," and "sexual orientation." (*Id.*). Through its search efforts, DIA located three documents (totaling 42 pages) that were responsive to Sack's request; all three documents were released in full, and are summarized in DIA's *Vaughn* index at entries V-8, V-9, and V-10. (*Id.*; *see also* Dkt. No. 22-2 ("DIA *Vaughn* Index")).

### 4. Counts XI and XII: DIA Request Nos. 0041-2012 and 0059-2012

Sack separately filed two FOIA requests with the Federal Investigative Services Division ("FIS") of the Office of Personnel Management. The first of these requests, submitted on July 5, 2011, sought records about polygraphers and polygraph examinations. (*See* Compl. at ¶ 67-68).

---

[6]     DoDPI and DACA are predecessors to the NCCA. (Williams Decl. at ¶ 6).

The second request was filed on October 14, 2011, and sought "records pertaining to periodic reviews of agencies' polygraph programs." (*Id.* ¶ 74). With respect to the first request, FIS referred two records to DIA for direct response: a Quality Assurance Program Inspection Report, and a Polygraph Memorandum of Agreement. (Williams Decl. at ¶ 22). Invoking FOIA Exemptions 3, 6, and 7(E), DIA withheld the Quality Assurance Program Inspection Report in full, and though it produced the Polygraph Memorandum of Agreement, DIA redacted portions of the document pursuant to FOIA Exemptions 3 and 6. (*Id.* ¶ 23, Ex. 11; *Vaughn* Index). Sack was notified of this determination by letter dated March 5, 2013. (Williams Decl. at Ex. 11). As for the second request, FIS referred another seven records to DIA for direct response, all of which consisted of additional Quality Assurance Program Inspection Reports. (Williams Decl. at ¶ 24; *Vaughn* Index). DIA withheld all seven documents from production, pursuant to FOIA Exemptions 3, 6, and 7(E). (*Id.*).

### 5. Count XIII: DIA Request No. 0135-2011

Sack submitted a separate FOIA request to DIA on December 23, 2010, seeking all correspondence dating back to 2002 between DIA employees and Sheila Reed, who the parties describe as "a well-known polygraph researcher." (Williams Decl. at ¶ 25, Ex. 12). After confirming receipt of this request by letter dated January 5, 2011, it appears DIA did not pursue Sack's request any further for some time. (*Id.* ¶ 26). Eventually, NCCA conducted a search for potentially responsive materials, within both its paper files and its electronic records. (*Id.*). As search terms, DIA utilized "Sheila Reed" and "Reed, Sheila," searching its ProCite Database and the NCCA share computer electronic storage drive. (*Id.*). No responsive records were located as a result of NCCA's search, and DIA advised Sack of these results by letter on January 23, 2013. (*Id.* ¶¶ 27-28, Ex. 13).

### B. Procedural History

Sack filed her thirteen-count complaint initiating this FOIA action against DoD on October 30, 2012.[7] Since then, Sack has withdrawn or abandoned several claims. Through the Joint Status Report, Sack voluntarily dismissed Count III on January 18, 2013. (*See* Dkt. No. 12 at ¶ 1(3)). The parties then proceeded with a stipulated summary judgment briefing schedule. The Department filed its Motion for Summary Judgment on March 22, 2013, (Dkt. No. 22 ("Def.'s MSJ")), and through her opposition brief, filed on April 22, 2013, Sack expressly withdrew her claims under Counts I, IV, and VIII, (*see* Dkt. No. 23 ("Pl.'s Opp'n") at 2-3). Finally, the Department advised the Court through its reply brief that Sack has withdrawn her claims under Count X. (*See* Dkt. No. 28-2). At this juncture, then, only Counts II, V, VI, VII, IX, XI, XII, and XIII remain in dispute.

In support of its motion, DoD submitted several declarations describing DIA's and NSA's response efforts to Sack's FOIA requests. As to DIA, the Court received the declaration of Alesia Williams, Chief of the FOIA Services Section within the FOIA and Declassification Services Branch for the DIA. (*See* Williams Decl.). In addition, Ms. Williams submitted a supplemental declaration along with the Department's reply. (*See* Dkt. No. 28-1 ("Supp. Williams Decl.")). The Department also filed a detailed *Vaughn* index, describing DIA's withholdings and redactions under FOIA's statutory exemptions. (*See Vaughn* Index). With

---

[7] Originally, Sack's claims were part of a larger lawsuit. Along with DoD, that lawsuit involved FOIA claims against the Central Intelligence Agency, the Department of Justice, the Office of Personnel Management, and the Office of the Director of National Intelligence. On the defendants' motion, the Court severed Sack's claims and ordered Sack to refile those counts relating to DoD through a separate action. Two related FOIA actions remain pending before the undersigned—*Sack v. Central Intelligence Agency* (12-cv-537) and *Sack v. U.S. Department of Justice* (12-cv-1755)—but the claims in those matters will be resolved separately and are not otherwise addressed in this Memorandum Opinion.

respect to NSA, the Court received the declaration of Diane Janosek, Deputy Associate Director for Policy and Records for the NSA." (*See* Janosek Decl.).[8]

DoD's Motion for Summary Judgment is now fully briefed and ripe for decision.

## ANALYSIS

Through her remaining claims, Sack challenges DIA's and NSA's compliance with their FOIA obligations in several respects. First, through Counts II, IX, and XIII, Sack asserts that DIA failed to perform an adequate search in response to her requests. Second, Sack insists that DIA improperly invoked FOIA Exemption 7(E) to fully withhold records responsive the FOIA requests described in Counts XI and XII. Third, Sack complains that NSA wrongly denied her request to be classified as an "educational institution" requester, treating her as an "all other" requester instead. And fourth, Sack argues that NSA improperly failed to provide her with two free hours of search time, as "all other" requesters are entitled to receive. After summarizing the overall legal principles governing its analysis, the Court addresses each issue in turn.

### A. Applicable Legal Standards

"FOIA was intended to 'pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.'" *ACLU v. U.S. Dep't of Justice*, 655 F.3d 1, 5 (D.C. Cir. 2011) (quoting *U.S. Dep't of Air Force v. Rose*, 425 U.S. 325, 361 (1976)). In view of this objective, FOIA requires federal agencies to release all records responsive to a proper request, unless the records fall within any of the statute's nine enumerated exemptions. *Loving v. U.S.*

---

[8] DoD also submitted an affidavit from David Hardy, the Federal Bureau of Investigation's Section Chief of the Record/Information Dissemination Section, Records Management Division. (*See* Dkt. No. 22-4 ("Hardy Decl.").) Mr. Hardy attested to DoD's justification for redacting the name and telephone number of an FBI employee under FOIA Exemptions 6 and 7(C). (*See generally id.*). Insofar as Sack does not challenge any redactions under Exemptions 6 or 7(C), however, the Court had no occasion to rely on Mr. Hardy's declaration in resolving this motion.

*Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008); *see* 5 U.S.C. § 552(b) (listing exemptions). "FOIA cases typically and appropriately are decided on motions for summary judgment." *Hainey v. U.S. Dep't of Interior*, 925 F. Supp. 2d 34, 40 (D.D.C. 2013). As in all cases, "[s]ummary judgment is in order where, viewing the record in the light most favorable to the non-moving party, the court finds that there remains no 'genuine issue as to any material fact.'" *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1433 (D.C. Cir. 1992) (quoting FED. R. CIV. P. 56(c)).

When a requester challenges the adequacy of an agency's search, the agency is entitled to summary judgment on such a claim if it can "demonstrate beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting *Truitt v. U.S. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)); *see also Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995). In many cases, "[s]ummary judgment may be based on affidavit, if the declaration sets forth sufficiently detailed information for a court to determine if the search was adequate." *Students Against Genocide v. U.S. Dep't of State*, 257 F.3d 828, 838 (D.C. Cir. 2001) (internal citation and quotation marks omitted). "If, however, the record leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper." *Truitt*, 897 F.2d at 542. The governing standard "is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*," *Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) (emphasis in original), and "adequacy is measured by the reasonableness of the effort in light of the specific request," *Larson v. U.S. Dep't of State*, 565 F.3d 857, 869 (D.C. Cir. 2009) (citation omitted). Put another way, to secure summary judgment, "the agency must show that it made a good faith effort to

conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).

When an agency withholds records in response to a FOIA request, the agency "bears the burden of proving the applicability of claimed exemptions." *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011); *Public Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 869 (D.C. Cir. 2009). Inasmuch as "FOIA mandates a strong presumption in favor of disclosure . . . the statutory exemptions, which are exclusive, are to be narrowly construed." *Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002) (internal citations and quotation marks omitted). Summary judgment is proper for the agency when its "affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson*, 565 F.3d at 862 (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Id.* (quoting *Wolf v. CIA*, 473 F.3d 370, 374-75 (D.C. Cir. 2007)). As a result, "[t]o successfully challenge an agency's showing that it complied with the FOIA, the plaintiff must come forward with 'specific facts' demonstrating that there is a genuine issue with respect to whether the agency has improperly withheld extant agency records." *Span v. U.S. Dep't of Justice*, 696 F. Supp. 2d 113, 119 (D.D.C. 2010) (quoting *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 (1989)).

**B. The Adequacy Of DIA's Searches**

*1. Count II*

Count II concerns Sack's request for information from DIA's Office of Security "representing aggregate data of polygraph examinations." (*See* Compl. at ¶ 14). As set forth above, DIA's ensuing search for records yielded no results. Displeased with this result, Sack now contests the adequacy of DIA's search efforts on several fronts. First, Sack complains that DIA too narrowly interpreted her request as limited to "bias-related" records, when the request sought aggregate polygraph data generally and had "nothing to do with bias." (Pl.'s Opp'n at 7). Second, Sack assails DIA for listing only some of the terms used during its search, rather than all of the terms, arguing that this showing cannot satisfy DIA's obligation to demonstrate an adequate search. Third, Sack contends that DIA wrongly focused its search on polygraph examiners, rather than polygraph examinations, as the request sought.

The Court can quickly dispense with the latter two arguments. Both contentions spring from the content of Ms. Williams' original declaration in this case. Therein, Ms. Williams attested that NCCA conducted its electronic search using "keywords, *such as* 'bias,' 'gender,' 'race,' 'age,' and 'sexual orientation.'" (Williams Decl. at ¶ 12) (emphasis added). She also averred that "the Office of Security reported that the office does not maintain any aggregate data concerning polygraph *examiners*." (*Id.*) (emphasis added). Sack seizes upon these statements in insisting that DIA has not satisfied its FOIA obligations—both because the agency failed to delineate the full contours of its review (providing an illustrative, rather than exhaustive, list of search terms), and because it searched for the wrong records (i.e., data regarding polygraph examiners, rather than polygraph examinations). Whatever weight these arguments might carry in another case, Ms. Williams' supplemental declaration neutralizes their impact here. Ms. Williams confirmed that despite her inclusion of the phrase "such as" in her original declaration,

the search terms she listed consisted of the entire universe of terms used during DIA's electronic review of NCCA records. (Supp. Williams Decl. at ¶ 5). Additionally, Ms. Williams explained that her reference to "polygraph examiners" was simply a typographical error; she confirmed that DIA actually interpreted Sack's request as seeking "aggregate data of polygraph examinations," and she confirmed with the Office of Security and NCCA that the offices interpreted Sack's request the same and searched accordingly. (*Id.* ¶¶ 4, 6-7). In view of these clarifications, Sack's arguments on these points are unavailing.

Sack's remaining argument—that DIA inappropriately narrowed her request as seeking only bias-related information—merits some further discussion. But ultimately, this theory too fails to persuade. According to Sack, her request was broadly-phrased, calling for all aggregate data regarding polygraph examinations. And because DIA limited its electronic search of NCCA records to bias-related keywords, Sack insists that this search cannot be deemed adequate. For its part, DIA rejoins that after consulting with NCCA leadership, it was determined that a search using the term "aggregate data" would not yield any results. Instead, DIA and NCCA leadership determined that "searching for information related to bias or unfairness was most likely to locate records responsive to plaintiff's request." (Supp. Williams Decl. at ¶ 5). In the Court's view, both sides overlook a critical issue in pressing these arguments—the specific scope of Sack's FOIA request. Sack's request was explicitly limited to records maintain by DIA's "security office," (Williams Decl., Ex. 2), which means that the parties' debate surrounding DIA's search of NCCA records—as compared with records maintained by the Office of Security, as Sack actually requested—largely misses the mark.

As our Circuit has repeatedly recognized, "adequacy is measured by the reasonableness of the effort in light of the specific request." *Larson*, 565 F.3d at 869 (quoting *Meeropol v.*

12

*Meese*, 790 F.2d 942, 956 (D.C. Cir. 1986)).  This means that an agency "is not obliged to look beyond the four corners of the request for leads to the location of responsive documents." *Kowalczyk v. U.S. Dep't of Justice*, 73 F.3d 386, 389 (D.C. Cir. 1996).  Here, the four corners of Sack's request clearly limited the scope of records she was seeking to records maintained by the Office of Security, not the NCCA.  And though Sack summarily complains that DIA fails to describe its search efforts in relation to the Office of Security altogether, the Court disagrees.

Ms. Williams avers that DIA consulted with "senior leaders" in the Office of Security, and that those leaders confirmed the Office of Security does not maintain aggregate data; instead its records systems are limited to "the individual personal polygraph examination reports of the many DIA and DoD employees who have been required to submit to a polygraph examination." (Supp. Williams Decl. ¶ 7).  In addition, "[t]he Office of Security leadership confirmed that it has not endeavored to develop aggregate data from these individual files or reports."  (*Id.*).  The Court finds that this explanation—derived from DIA's consultation with senior officials familiar with the Office of Security's records—demonstrates that DIA appropriately approached Sack's request and that a more detailed search on the Office of Security's part would have been "futile and . . . unnecessary."  *American-Arab Anti-Discrimination Comm. v. U.S. Dep't of Homeland Sec.*, 516 F. Supp. 2d 83, 88 (D.D.C. 2007); *see also Amnesty Int'l U.S.A. v. CIA*, No. 07 Civ. 5435, 2008 WL 2519908, at *11 (S.D.N.Y. June 19, 2008) ("FOIA does not demand a search that would be futile.").[9]

Moreover, setting aside the question of whether the scope of Sack's request obligated DIA to search NCCA's records systems, the Court agrees that it was at least reasonable for DIA

_____

[9]     Relatedly, DIA's Office of Security had no obligation to compile its individual polygraph reports into an aggregate form to respond to Sack's request.  FOIA "does not impose any duty on the agency to create records." *ACLU*, 655 F.3d at 5 n.3 (quoting *Forsham v. Harris*, 445 U.S. 169, 186 (1980)) (internal alterations omitted).

to do so, given its belief that responsive information was most likely to be found within NCCA records, if anywhere. *See, e.g.*, *Lechliter v. Rumsfeld*, 182 F. App'x 113, 115-16 (3d Cir. 2006) (deeming reasonable the agency's decision to search two offices "determined to be the only ones likely to possess responsive documents"); *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 822 F. Supp. 2d 12, 19 (D.D.C. 2011) (finding it reasonable to direct search efforts "at the people and offices most likely to have responsive information"). And in carrying out that aspect of its search, it was equally reasonable for DIA to rely upon the bias- and EEO-related search terms it used. As noted, DIA determined, in consultation with NCCA officials, that a search for "aggregate data" would have been fruitless. In turn, the agency interpreted the scope of Sack's request in a manner consistent with the scope of Sack's accompanying FOIA requests to DIA, all of which sought bias- and EEO-related information related to polygraphs. (*See* Williams Decl., Exs. 1, 5). Under the totality of the circumstances, this was an appropriate approach. *See Rein v. U.S. Patent & Trademark Office*, 553 F.3d 353, 363 (4th Cir. 2009) (concluding that agency's "decision to use the searches conducted in response to [prior, similar] requests as the starting point for responding to [current] requests was not inherently unreasonable and appears to be a practical and common-sense approach," since "[t]he requests sought similar information related to the same subject matter").

In sum, the Court concludes that DIA met its FOIA obligations to conduct a reasonable and adequate search for potentially responsive records as to Count II of the Complaint.

### 2. *Count IX*

Through Count IX, Sack challenges DIA's response to her request for studies pertaining to polygraph bias. While DIA produced three responsive records, detailed at entries V-8, V-9,

and V10 of DIA's *Vaughn* index, Sack nevertheless contests the adequacy of DIA's search efforts. In so doing, Sack presses two familiar arguments. Neither is persuasive.

First, Sack assails Ms. Williams' use of the phrase "such as" in introducing the search terms used by NCCA. The Court rejects this argument for the reasons already stated; as with Count II, Ms. Williams subsequently confirmed that the search terms listed were the only terms used by DIA in carrying out this search. (Supp. Williams Decl. at ¶ 8). Second, Sack again complains about DIA's failure to provide specific information concerning the nature of the search performed within the Office of Security. But again, Sack is wrong. As before, Ms. Williams attests that through discussions with Office of Security leadership, DIA determined that it was "highly unlikely that [responsive] records would be located" within the office, insofar as the Office of Security maintains only individual employee polygraph reports, and not research or studies about polygraph biases. (*Id.* ¶¶ 7-8). This explanation sufficiently establishes that a more detailed search was unnecessary and would have been futile. *See American-Arab Anti-Discrimination Comm.*, 516 F. Supp. 2d at 88; *Amnesty Int'l*, 2008 WL 2519908, at *11. Moreover, despite the unlikelihood that responsive records would be found in the Office of Security, the record establishes that the Office of Security searched its electronic files anyway, using the same keywords as NCCA—keywords with which Sack does not take issue for purposes of this particular request. (Williams Decl. at ¶ 18; Supp. Williams Decl. at ¶¶ 8-9). Despite these efforts, DIA did not uncover any responsive records. Simply put, DIA's search efforts in response to this request comported with its obligations under FOIA, and none of Sack's arguments establishes otherwise.

### 3. *Count XIII*

Sack next takes issue with DIA's response to her request for correspondence between DIA employees and Sheila Reed, as pled through Count XIII. In so arguing, Sack mounts two separate challenges to the adequacy of DIA's search. First, Sack argues that DIA wrongly confined its search efforts to NCCA, when it should have reviewed records held by other components of DIA, particularly the Office of Security. Second, Sack argues that even DIA's search within NCCA fell short, insofar as DIA inappropriately neglected to review NCCA's email systems for potentially responsive documents. Neither theory is availing.

To begin with, the record establishes that DIA's focus on NCCA's records systems, as opposed to documents with the Office of Security, was reasonable and appropriate. As set forth in Ms. Williams' declaration, DIA consulted directly with leadership from the Office of Security and ultimately determined that a search of Office of Security records was unlikely to uncover any responsive records. (Supp. Williams Decl. at ¶ 16). According to Ms. Williams, "[t]he Office of Security does not conduct polygraph research," but is instead focused on "conduct[ing] polygraph examinations based on the guidance provided by the NCCA." (*Id.*). She further avers that none of the leadership staff members are personally acquainted with Ms. Reed, such that they would be likely to possess responsive email messages; indeed, the Office of Security leadership confirmed that they have not had any communication with Ms. Reed. (*Id.*). Based on this assessment, the Court agrees that an additional search of the Office of Security's records was unnecessary. *See American-Arab Anti-Discrimination Comm.*, 516 F. Supp. 2d at 88; *Amnesty Int'l*, 2008 WL 25119908, at *11. To the contrary, based on NCCA's mission of assisting federal agencies with education and tools for credibility assessment, it was appropriate for DIA to conclude that any responsive records were likely to be found within NCCA, and to focus its search efforts accordingly. *See Lechliter*, 182 F. App'x at 115-16; *Citizens for Responsibility &*

*Ethics in Wash.*, 822 F. Supp. 2d at 19. At bottom, Sack is effectively arguing that responsive documents might exist elsewhere within DIA, but she offers nothing beyond her own supposition in support of this theory. This approach simply comes up short. *See, e.g.*, *Hodge v. FBI*, 703 F.3d 575, 580 (D.C. Cir. 2013) ("As we have said before, mere speculation that as yet uncovered documents may exist does not undermine the finding that the agency conducted a reasonable search.") (internal quotation marks and citation omitted).

As for Sack's second argument, it is now effectively moot. Ms. Williams confirms that DIA has since undertaken a supplemental search of NCCA's email systems and archives for potentially responsive records, using Ms. Reed's first and last name as search terms in the "to" and "from" fields of messages. (Supp. Williams Decl. at ¶ 15). These additional search efforts did not yield any responsive records. Accordingly, the Court concludes that DIA discharged its FOIA obligations with respect to Sack's claim under Count XIII.

## C. DIA's Withholdings: FOIA Exemption 7(E)

Along with her claims surrounding DIA's search efforts, Sack also insists that DIA improperly withheld responsive documents under FOIA's statutory exemptions. In particular, Sack contends that DIA wrongly invoked Exemption 7(E) to withhold the various Quality Assurance Program Inspection Reports ("QAP Reports") that were uncovered during DIA's search. (*See* Vaughn Index, V-1, V-2, V-3, V-4, V-5, V-6, V-7, V-11).[10]

"Exemption 7(E) shields information if 'disclosure could reasonably be expected to risk circumvention of the law.'" *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1192 (D.C. Cir. 2009) (quoting 5 U.S.C. § 552(b)(7)(E)). In this Circuit, "Exemption 7(E) sets a relatively low bar for

---

[10]    Although DIA redacted portions of these same documents (and others) pursuant to FOIA Exemptions 3, 6, and 7(C), Sack does not challenge the propriety of these withholdings. (*See* Pl.'s Opp'n at 11). Instead, Sack strictly takes issue with DIA's reliance on Exemption 7(E) to withhold the entirety of the above-referenced documents in full.

the agency to justify withholding: 'Rather than requiring a highly specific burden of showing how the law will be circumvented, exemption 7(E) only requires that the [agency] demonstrate logically how the release of the requested information might create a risk of circumvention of the law.'" *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011) (quoting *Mayer Brown LLP*, 562 F.3d at 1194) (alteration in original). With respect to the QAP Reports at issue, DIA maintains that "disclosure of this particular information could diminish the effectiveness of polygraph examination as an investigative tool." (Williams Decl. at ¶ 25). As DIA explains things, "the role of the NCCA in examining the polygraph programs of other agencies"—and, in turn, in creating these QAP Reports—"was to identify the potential weaknesses or vulnerabilities that may allow bad actors to fool that agency and conduct illegal activities without detection." (*Id.* ¶ 26). According to DIA, then, "[i]f this information [were] disclosed to the general public, . . . a determined bad actor could identify agencies with greater polygraph program vulnerabilities" that "could then be exploited." (*Id.*). The Court agrees that this explanation satisfies Exemption 7(E)'s standards to justify DIA's withholdings.

None of Sack's arguments to the contrary compel a different outcome. Sack first seeks to distinguish between polygraph examinations conducted as part of a criminal investigation, on the one hand, and employment-related polygraph programs, on the other. In her view, while the release of information concerning polygraph examinations of criminal suspects could jeopardize public safety and risk the subversion of law—thus justifying the withholding of "all polygraph information," (*see* Pl.'s Opp'n at 14) —details surrounding the employment-screening polygraph processes used by federal agencies pose no such risk. While the Court recognizes that there are certainly some distinctions between the two scenarios, neither the case law nor common sense supports the hard line in the sand Sack seeks to draw. True, much of the precedent supporting the

withholding of polygraph information under Exemption 7(E) arises in the criminal investigatory context. *See, e.g.*, *Piper v. U.S. Dep't of Justice*, 294 F. Supp. 2d 16, 30 (D.D.C. 2003) (collecting cases). But the D.C. Circuit's precedents make clear that the application of Exemption 7(E) should not be so narrowly cabined. As DIA rightly observes, our Court of Appeals has upheld the invocation of Exemption 7(E) to withhold information that could reasonably be expected to allow insight into the CIA's clearance and investigatory processes used during the background investigations of its officers. *See Morley v. CIA*, 508 F.3d 1108, 1128-29 (D.C. Cir. 2007) ("It is self-evident that information revealing security clearance procedures could render those procedures vulnerable and weaken their effectiveness at uncovering background information on potential candidates."). *Cf. Tax Analysts v. IRS*, 294 F.3d 71, 79 (D.C. Cir. 2002) ("An agency may seek to block the disclosure of internal agency materials relating to guidelines, techniques, sources, and procedures for law enforcement investigations and prosecutions, even when the materials have not been compiled in the course of a specific investigation."). The Circuit's reasoning in *Morley* applies with equal force here.

Disclosure of the QAP Reports could reasonably be expected to circumvent the efficacy of background investigations undertaken by federal agencies. Indeed, these concerns are particularly heightened in this case, given that the QAP Reports in contention pertain to the polygraph screening programs of *federal law enforcement agencies*—the United States Secret Service; the Bureau of Customs and Border Protection; the Bureau of Alcohol, Tobacco, Firearms, and Explosives; and the Drug Enforcement Administration. (*See Vaughn* Index V-1, V-2, V-3, V-4, V-5, V-6, V-7, V-11). The Court agrees that placing this information in the public domain at least creates a risk that bad actors could leverage those details to subvert the background screening process, thereby gaining access to sensitive (if not classified) information

19

that could be exploited to harm national security and homeland security interests. The Court thus rejects Sack's contention that because the QAP Reports relate to employment-based polygraph programs, their disclosure does not implicate the sort of risks that would justify the invocation of Exemption 7(E).

Second, Sack asserts that even though some of the information in the QAP reports may be properly exempt from disclosure, DIA failed to satisfy its segregability obligations to release information that, at least in Sack's mind, poses no risk of circumvention of the law. More specifically, Sack does not dispute that the sections of the QAP Reports "describing *uncorrected* vulnerabilities in agencies' polygraph programs is properly exempt" under Exemption 7(E). (Pl.'s Opp'n at 11) (emphasis in original); (*Id.* at 14) ("Sack concedes that information which would highlight *current* vulnerabilities in intelligence and law enforcement agencies' employment screening polygraph programs would be properly exempt.") (emphasis in original). Instead, Sack takes issue with DIA's withholding of those aspects of the QAP Reports pertaining to vulnerabilities that "*have been fixed* or *did not exist in the first place*." (*Id.*). In the Court's view, this is a distinction without a meaningful difference. Forcing DIA to release details concerning the efficacy of polygraph programs used by federal law enforcement agencies— whether related to vulnerabilities, strengths, or otherwise—implicates the threats and dangers outlined above, creating at least a risk that subversive individuals will be armed with advanced knowledge of the procedures used by the United States to screen applicants for sensitive employment positions and security clearances. In short, Sack's efforts to cast various aspects of the withheld QAP Reports outside of Exemption 7(E)'s reach are simply unpersuasive.

Finally, Sack assails DIA for assertedly misrepresenting that the QAP Reports were voluntarily created at the request of agencies, when the QAP Reports were mandated under

Office of Personnel Management policy.  Sack suggests that these circumstances undermine the propriety of DIA's withholdings.  For its part, DIA disclaims any intent to "leave the impression that a law enforcement agency pursues this type of inspection without any requirement to do so." (Supp. Williams Decl. at ¶ 13).  Either way, this argument is much ado about nothing.  Whether the QAP Reports are created in connection with mandatory or voluntary inspections, the end result is the same: the content of these documents summarizes the polygraph programs of federal law enforcement agencies, and for the reasons stated, the release of that information "could reasonably be expected to risk circumvention of the law."  *Mayer Brown LLP*, 562 F.3d at 1192.

In sum, the Court agrees that DIA has met its burden to demonstrate that the QAP Reports uncovered during its search were properly withheld under Exemption 7(E).

### D.  Sack's Request That NSA Classify Her As An "Educational Institution" Requester

Unlike her claims against DIA, Sack's remaining claims against NSA do not stem from an allegedly inadequate search or the invocation of supposedly inapplicable exemptions.  Indeed, with respect to the specific FOIA requests at issue, NSA did not even undertake a search for potentially responsive records, and it certainly did not withhold any such records under FOIA's statutory exemptions.  Rather, Sack alleges that NSA improperly refused to classify her as an "educational institution" requester for purposes of FOIA's fee provisions.

Under FOIA, fees assessed in connection with a request generally include "reasonable standard charges for document search, duplication, and review, when records are requested for commercial use."  5 U.S.C. § 552(a)(4)(A)(ii)(I).  That said, "[t]he fees required by FOIA are reduced for certain categories of requesters."  *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 122 F. Supp. 2d 13, 20 (D.D.C. 2000).  As relevant here, "when records are not sought for commercial use and the request is made by an educational . . . institution," the statute provides

that "fees shall be limited to reasonable standard charges for document duplication." 5 U.S.C. § 552(a)(4)(A)(ii)(II). In other words, when records are sought by an "educational institution"—as that term is interpreted in the FOIA context—the requester is not assessed fees for time spent searching for and reviewing potentially responsive records; the requester is responsible solely for duplication costs. *See Nat'l Sec. Archive v. U.S. Dep't of Def.*, 880 F.2d 1381, 1382-83 (D.C. Cir. 1989) ("In such cases, an agency may impose upon the requester only the cost of duplicating the records it releases."). The Court has jurisdiction to review an agency's fee-category determination. *Elec. Privacy Info. Ctr. v. U.S. Dep't of Def.*, 241 F. Supp. 2d 5, 9 (D.D.C. 2003). And though the appropriate scope of judicial review appears somewhat unsettled, *see Nat'l Sec. Archive*, 880 F.2d at 1383 (declining to resolve the question), both parties here agree that the Court's review should be *de novo*, and limited to the record before NSA at the time of its determination. With this framework in mind, the Court turns to the question at hand.

Sack maintains that as a representative of the University of Virginia's Department of Political Science—and, more specifically, as a University representative seeking information in furtherance of the Department's scholarly research goals—she should have been classified under the "educational institution" fee category. For its part, NSA rejoins that the information put forward by Sack was insufficient to establish that she was acting on behalf of the University or the Department at the time she submitted her FOIA requests, rather than pursuing her own individual research goals. While both sides mount credible arguments in support of their positions, on balance, the Court agrees with NSA that Sack failed to present sufficient evidence to justify her classification as an "educational institution" requester.

The Court notes at the outset that there is a dearth of authority concerning this particular question. As a starting point, DoD regulations define the term "educational institution" as:

> [A] pre-school, a public or private elementary or secondary school, an institution of graduate high education, an institution of undergraduate higher education, an institution of professional education, and an institution of vocational education, which operates a program or programs of scholarly research.

32 C.F.R. § 286.28(e)(4). Further, the OMB fee guidelines—to which agency regulations must conform, 5 U.S.C. § 552(a)(4)(A)(i)—make clear that the "educational institution" category extends to representatives acting on behalf of the institution, as long as the request "serves a scholarly research goal of the institution." *OMB Uniform Freedom of Information Act Fee Schedule and Guidelines*, 52 Fed. Reg. 10,012, 10,014 (Mar. 27, 1987); *see also* 132 Cong. Rec. S14298 (Sept. 30, 1986) (remarks of Sen. Leahy) ("A request made by a professor or other member of the professional staff of an educational . . . institution should be presumed to have been made by the institution."). The OMB fee guidelines elaborate on this concept with some concrete examples, explaining that:

> [A] request from a professor of geology at a State university for records relating to soil erosion, written on letterhead of the Department of Geology, could be presumed to be from an educational institution. A request from the same person for drug information from the Food and Drug Administration in furtherance of a murder mystery he is writing would not be presumed to be an institutional request, regardless of whether it was written on institutional stationary.
>
>        \*           \*           \*
>
> The institutional versus individual test would apply to student requests as well. A student who makes a request in furtherance of the completion of a course of instruction is carrying out an individual research goal and the request would not qualify . . . .

52 Fed. Reg. at 10,014. As explained in the Justice Department FOIA Guide, "[t]o qualify for inclusion in this fee subcategory, the request must serve a scholarly research goal of the institution, not an individual goal. Thus, *a student seeking inclusion in this subcategory, who 'makes a request in furtherance of the completion of a course of instruction is carrying out an individual research goal*,' and would not qualify as an educational institution requester." U.S. Department of Justice, Guide to the Freedom of Information Act, p. 102 (2009) (emphasis

added) (citing the OMB fee guidelines). As one commentator recently conceded (plaintively), the OMB fee guidelines confirm that individual research projects serve a "training" function for the student and do not meet the FOIA educational institutional exemption. Pall, *The High Costs of Costs: Fees as Barriers to Access Within the United States and Canadian Freedom of Information Regimes*, 7 Cardozo Pub. L. Pol'y & Ethics J. 599, 622 (2009). The wisdom of this statutory and regulatory scheme is not before the Court, only its application to the record.

Under this framework, the Court finds that Sack did not sufficiently establish she was acting on behalf of the University's Department of Politics through her requests, or that she was seeking the requested information in furtherance of the University's scholarly goals. As an initial matter, Sack's original proffer to the NSA—essentially consisting of her own, conclusory assertion that her requests fell under the "educational institution" category, (*see* Janosek Decl., Ex. 1)—was plainly inadequate. On appeal, Sack supplied NSA with a letter—written on University of Virginia letterhead and signed by the Director of Graduate Studies in the Department of Politics, Professor Jeffrey Jenkins—which stated that Sack's research objectives were "consistent with U. Va.'s scholarly research goals," that Sack's requests were submitted "on behalf of [the] institution," and that Sack was "acting as a representative of the University of Virginia's Department of Politics." (*Id.*, Ex. 3). In NSA's view, this proffer still fell short, and the agency concluded that Mr. Jenkins' contention that Sack was representing the Department of Politics was "not supportable." (*Id.*, Ex. 4). While it is a close question, the Court agrees. Professor Jenkins' letter was wholly conclusory – while he asserted that Sack's request was "on behalf of the institution," he did not specify that the request was being used to support a research project being carried out by him, any other professor, or any department of the university. Instead, his letter parroted the language from Sack's original request, which was that she

"intend[ed] to review, evaluate, synthesize, and present the requested data, analyses, policies, protocols, and practices in a publically available, usable form," adding that "[t]his intention is consistent with U. Va.'s scholarly research goals." (*Id.*, Ex. 3). Sack's original request identified her as a Ph.D. student preforming research, and NSA was entitled to conclude that her request furthered an "individual research goal" associated with completing a course of her graduate studies or her dissertation. Professor Jenkins' letter could have made clear that Sack's research was for something other than fulfilling her course requirements, but it conspicuously failed to do so.

In sum, all of Sack's submissions contained vague and conclusory wording that evaded the central question presented by the OMB fee guidelines: whether the request was for Sack's coursework, or whether it was for a project sponsored by the educational institution. Sack, as the requester, had the burden of proof on this issue, and her proof was simply insufficient. To hold otherwise would allow a student's FOIA request supporting her coursework to fall within the educational institution exemption, so long as the request does not mention her coursework and so long as an instructor asserts (without explanation) that the request is "on behalf of the institution" and that the student's research is "consistent" with the goals of the institution. This would be an end-run around the OMB fee guidelines. Accordingly, the Court holds that NSA did not err by refusing to classify Sack as an "educational institution" requester for purposes of FOIA Requests 64010 and 64011. [11]

---

[11] The Court pauses to emphasize the narrow scope of its holding. In the future, Sack or any other student requester can qualify for "educational institution" classification under FOIA by supplying the agency with confirmation—on institutional letterhead, and written by an appropriate official—that the research underlying the student's request is not in furtherance of the student's coursework and is made on behalf of the institution and in furtherance of research sponsored by the institution.

Finally, the Court need not tarry long on Sack's alternative challenge to NSA's policies surrounding two free search hours. Plaintiff does not dispute that she refused to either pay fees or commit to making any payment on the requests at issue. NSA's requirement that Plaintiff remit payment in the amount of $440.00, which is one-half of the total amount of the estimated costs, minus the free search time, (*Id.*, Ex. 2), is in accordance with its regulations, 32 C.F.R. § 286.28(e)(2)(i)(B), which unambiguously state that "a search for responsive records will not be initiated until the requester indicates a willingness to pay assessable costs appropriate for the category determined by the Component." *See* Janosek Decl. ¶ 25. Nothing in the FOIA precludes an agency from first requiring that the payment and scope of a request be clear before any search is conducted. *See Chaplin v. Stewart*, 796 F. Supp. 2d 209, 211-12 (D.D.C. 2011) (finding that the agency was entitled to judgment as a matter of law where agency complied with DOJ regulations by informing plaintiff about the fee requirements and suggesting ways to reduce his costs and plaintiff neither paid nor committed to paying the assessed fees); *Saldana v. Bureau of Prisons*, 715 F. Supp. 2d 10, 16-17, 21 (D.D.C. 2010) ("because [plaintiff] neither reduced the scope of his January 2006 request nor paid, or agreed to pay, the associated search fee, [he] therefore has not exhausted his administrative remedies"); *Research Air, Inc. v. Kempthorne*, 589 F. Supp. 2d 1, 10 & n.6 (D.D.C. 2008) (agency properly refused to process a FOIA request where the requester rejected the notion that he would be required to pay a fee and agency "demanded only that [plaintiff] either narrow his request in order to reduce their estimated costs or commit to future payment for the costs incurred by [the agency] in processing the search request").

## **CONCLUSION**

For the foregoing reasons, the Court concludes that DoD's Motion for Summary Judgment is **GRANTED**. The Court already has issued an appropriate Order.

Date: December 13, 2013

_____
ROBERT L. WILKINS
United States District Judge